Austin Norris (SBN 284603)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (213) 680-8184
austin.norris@kirkland.com

Aaron M. Marks, P.C. (*Pro Hac Vice* forthcoming)
Ahson T. Azmat (*Pro Hac Vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
aaron.marks@kirkland.com
ahson.azmat@kirkland.com

*Attorneys for Plaintiffs*
*Tomales Bay Capital Anduril III, L.P. and Tomales Bay Capital Anduril III GP, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| TOMALES BAY CAPITAL ANDURIL III, L.P. AND TOMALES BAY CAPITAL ANDURIL III GP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LEO GROUP CO. LTD.,<br><br>Defendant. | Case No. 24-cv-4776<br><br>**COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Parties ................................................................................................................................. 5

    A.    Plaintiffs ................................................................................................................. 5

    B.    Defendant ............................................................................................................... 5

Jurisdiction and Venue ....................................................................................................... 6

Factual Allegations ............................................................................................................. 6

    A.    Leo Group Makes Misrepresentations In Order For Leo Investments to Become an LP of the Fund and Take on Various, Strict Confidentiality Obligations. .............................................................................................................. 7

    B.    Leo Group Blatantly Disregards Leo Investments' Obligations, and Disseminates Confidential Information About the Investment. ............................ 10

    C.    Leo Investments Files a Lawsuit Arising Out of the SpaceX Investment in Delaware. ............................................................................................................. 13

    D.    Leo Group Availed Itself of the Privilege of Conducting Activities within California. ............................................................................................................. 14

Cause of Action ................................................................................................................ 16

Prayer for Relief ............................................................................................................... 17

Demand for Jury Trial ...................................................................................................... 18

**INTRODUCTION**

1. Plaintiffs Tomales Bay Capital Anduril III, L.P. ("Anduril III" or the "Fund") and Tomales Bay Capital Anduril III GP, LLC (the "GP," and together with Anduril III, "Plaintiffs") bring this action against Defendant Leo Group Co. Ltd. ("Leo Group") for fraud.

2. This case arises out of an investment that never actually occurred. The story of this failed investment spans two continents and a handful of sophisticated businesses, but at heart was a deception and manipulation as simple as it was damaging.

3. In the late fall of 2021, the founder and CEO of Tomales Bay Capital, Iqbaljit Kahlon, was raising funds from investors for a Tomales Bay vehicle to purchase $528 million of highly coveted Space Exploration Technologies Corporation ("SpaceX") common and preferred shares in the private market (the "Investment"). Mr. Kahlon, managing member of the GP, planned to execute the Investment primarily through Anduril III, a fund specifically created for the purchase of SpaceX stock. The Fund's purchase of SpaceX stock would ultimately be subject to approval by SpaceX through the unique approval processes it imposes on its would-be investors.

4. Both the Fund and the GP are headquartered in San Francisco, California, which was also the home base from which Mr. Kahlon solicited, and received inquiries from, investors to become limited partners ("LPs") in the Fund. As the Fund's subscription materials made clear to prospective investors from the outset, the Fund's sole purpose was to purchase shares of SpaceX, a company also based out of California. The shares to be purchased would be available on the private market only for a limited time; and only prospective investors who could satisfy a series of stringent and exacting Fund requirements that mirrored those that SpaceX generally imposed on stockholders were good candidates for being LPs.

5. One of the key requirements of LPs concerned confidentiality. Given the nature of SpaceX's rocket and satellite launch business, and the fact that it enters into highly sensitive commercial relationships with government entities such as the United States Department of Defense, SpaceX is intensely averse to unnecessary public attention. For example, SpaceX generally does not accept investments or authorize transfers of shares in the private market that will attract—or seek out—media attention.

6. Understanding this sensitivity, Plaintiffs took special care to communicate the need for confidentiality to all prospective investors. Plaintiffs also imposed strict confidentiality conditions for admission to the Fund as a result of this sensitivity.

7. The Fund's confidentiality concerns were reduced to writing in the form of binding contractual provisions governing LP membership. While Plaintiffs would allow LPs to disclose limited details about the Investment to the extent required by law on a case-by-case basis, the GP would actively participate with respect to such disclosures through the extensive notice and cooperation clauses of the confidentiality provision of the Limited Partnership Agreement (the "LPA"). Any further disclosures not required by law would be strictly prohibited.

8. During this same time period in the fall of 2021, Mr. Kahlon was introduced to Leo Group through an investment broker. Leo Group, through one of its directors and vice president of investments, Xubo "Steven" Zhang, expressed interest in investing in SpaceX via the Fund. In communications with Mr. Kahlon and the investment broker, Zhang and Leo Group sought to contribute $50 million dollars towards the purchase of SpaceX stock through a Leo Group-affiliated limited-purpose investment vehicle, Leo Investments Hong Kong Limited ("Leo Investments").

9. Given SpaceX's concerns for confidentiality, Plaintiffs informed Leo Group that Leo Investments would only be permitted to join as an LP if it agreed and adhered to strict limitations on disclosure of the Investment. To that end, the parties discussed and negotiated Leo Investments' entry into the Fund's LPA, as well as a side letter to the LPA (the "Side Letter", and together with the LPA, the "Agreements"), that together set out strict and specifically tailored parameters for disclosure issues that may arise with respect to the Investment. As detailed herein, Leo Group's key executive discussed the confidentiality provisions directly with Mr. Kahlon and represented that Leo Investments and its affiliates would comply with the provision. These provisions included the obligations that Leo Investments notify the GP in advance of any disclosure and take all necessary steps to avoid or minimize any disclosure.

10. On or around November 15, 2021, Leo Investments executed Fund subscription materials, $50 million was wired to the Fund's California-based bank on Leo Investments' behalf, and

1   Leo Investments purported to join Anduril III as an LP.  Contemporaneously, the GP and the Fund
2   also obtained commitments and funding of approximately $378 million from additional investors/LPs,
3   while $100 million was to be funded by another Tomales Bay fund.  While SpaceX had preliminarily
4   given the green light to the GP to purchase the $528 million of shares from another investor that was
5   interested in selling, SpaceX's ultimate approval of the purchase, including SpaceX's waiver of its
6   "right of first refusal" ("ROFR") as to the shares, remained outstanding.

7   11.   Unfortunately, within days of Mr. Zhang's representations, Leo Investments' execution
8   of the LPA and Side Letter to become an LP, and $50 million being wired to the Fund, Leo Group
9   made a filing about the Investment with the Shenzhen Stock Exchange (the "Stock Exchange") and
10  broadcasted the planned (but as-yet unconsummated) investment in SpaceX through the Fund all over
11  the Chinese media markets.  As Plaintiffs have come to learn, this publication occurred through various
12  efforts by Leo Group, including interviews with journalists and social media posts, *each of which,*
13  *including the filing with the Stock Exchange, was in blatant violation of Leo Investments' notice,*
14  *cooperation, minimization, and other confidentiality obligations to the Fund.*  Far from honoring the
15  obligations of the LPA to notify and cooperate with the GP in advance and to strictly minimize the
16  extent of any disclosures, Leo Group, among other things, gave interviews with journalists who
17  promptly published stories about the anticipated investment in newspapers and other online media
18  sources.  At the same time, Leo Group executives *posted news of the Investment on social media*,
19  including through employees' social media accounts.

20  12.   News articles and social media posts describing details of the Fund's investment in
21  SpaceX began appearing on the Internet.  For example, Shanghai Securities News reported on Leo
22  Group's participation in the investment, quoting Zhou Liming, a senior Leo Group executive who
23  participated in an interview regarding the Investment.  At least a dozen additional news outlets
24  published similar articles, including, but not limited to, Cailian Press, Securities Times, Reuters, East
25  Money, National Business Daily, Yicai Global, Beijing Business Daily, JRJ.com, Time Finance News,
26  Cfi.cn, Sina Finance, and Southmoney.  In addition to quotes from Leo Group executives regarding

the anticipated investment in SpaceX, these articles reported on confidential details about Leo Group's capital contribution size, the expected size of the full Fund, and details regarding SpaceX's operations.

13. As a consequence of the extraordinary media attention that Leo Group caused, Leo Group's own stock price spiked up dramatically. Between November 16 and November 18, 2021, Leo Group's stock price in China rose by 20%. On November 16, Leo Group's stock price increased by 3.4%; on November 17 it increased by 9.88%; and on November 18 it increased by 10.11%. Leo Group's stock price increase prompted the Shenzhen Stock Exchange to suspend trading of Leo Group's stock and resulted in Leo Group making a disclosure to the exchange regarding "Abnormal Stock Trading Fluctuations." The increase in stock price over these few days resulted in an increase in market capitalization for Leo Group of over $627 million.

14. SpaceX learned of the media reports out of China shortly after their publication. SpaceX's CFO contacted Mr. Kahlon to express the company's displeasure and to state that the Fund's purchase of the $528 million of SpaceX shares from another investor would not be approved by SpaceX—if approved at all—if Leo Investments remained an LP of the Fund.

15. Accounting for the best interests of all LPs of the Fund, the GP requested that Leo Group voluntarily remove Leo Investments from the Fund. Leo Group refused, however, so the GP had no choice but to exercise its rights under the LPA and remove Leo Investments as an LP. By taking this action, Mr. Kahlon hoped to salvage the situation, placate SpaceX, and allow the Fund to move forward with the Investment for the sake of the remaining LPs.

16. SpaceX, however, did not ultimately approve the Fund's purchase of the $528 million in shares. Rather, notwithstanding the fact that SpaceX had pre-approved Anduril III for the purchase just weeks earlier, it exercised its ROFR and instead purchased $428 million of the $528 million of shares for the company's own account—an action SpaceX has rarely ever taken. SpaceX did allow the other Tomales Bay fund to purchase $100 million of the shares, but the Investment the Fund had been hoping to complete was ultimately lost. Upon information and belief, SpaceX took this action in exercising its ROFR as to the Fund's shares because of the media spectacle that Leo Group had created days earlier.

17. Anduril III, the GP, and their investors have been damaged to a significant extent—over $150 million in losses to date—due to the lost opportunity to invest in SpaceX stock. Leo Group's manipulative and deceptive conduct—specifically, in inducing Plaintiffs to permit Leo Investments to become an LP through misrepresentations while simultaneously causing Leo Investments to blatantly breach its confidentiality obligations, all in an effort to bolster Leo Group's public profile and increase its own stock price—was the cause of this extensive damage to Plaintiffs.

18. On February 23, 2022, Leo Investments filed a complaint in the Delaware Court of Chancery against the Fund, the GP, and Iqbaljit Kahlon, alleging breach of contract and breach of fiduciary duty (the "Delaware Action"). The parties to the Delaware Action have engaged in substantial discovery. Discovery in the Delaware Action is subject to a protective order. In compliance with the "use" provision of this protective order, this Complaint is narrowly focused, as much of the information Plaintiffs learned about Leo Group and its activities through discovery in the Delaware Action cannot be used for pleading purposes at this time.

**PARTIES**

**A.     Plaintiffs**

19. Plaintiff Tomales Bay Capital Anduril III, L.P. is a limited partnership based out of San Francisco, California, and was formed in February 2021 under the laws of the State of Delaware.

20. Plaintiff Tomales Bay Capital Anduril III GP, LLC is a limited liability company based out of San Francisco, California. It was formed under the laws of the State of Delaware and is the General Partner of the Fund.

**B.     Defendant**

21. On information and belief, Defendant Leo Group Co. Ltd. is a duly organized and validly existing company incorporated in the People's Republic of China. Leo Group has its principal place of business in the Shanghai and Zhejiang provinces of China, and its stock trades on the Shenzhen Stock Exchange.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because each Plaintiff is a citizen of a different state from Defendant, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23. The violations of law alleged in this Complaint have injured Plaintiffs in this judicial district. Venue is therefore proper in the Northern District of California pursuant to 28 U.S.C. § 1391.

24. This Court has personal jurisdiction over Leo Group. Leo Group has had sufficient contacts with California such that the exercise of specific jurisdiction over Defendant would not offend the Due Process Clause.

25. Defendant purposefully directed its activities at California and consummated the transaction with Plaintiffs, both of which are based in California, by, among other things: (1) making misrepresentations to a California-based General Partner for the purpose of arranging for its subsidiary to become a limited partner in a California-based entity (the Fund) in order to invest in another California company (SpaceX); (2) owing continuing obligations to its California partners, including the Plaintiffs; (3) engaging and working with California lawyers from a California law firm, MagStone Law in Sunnyvale, to represent it during negotiations with Plaintiffs; (4) causing investment capital of $50 million to be wired to the Fund's California bank; and (5) causing harm to Plaintiffs in California. Plaintiffs' claims arise out of and relate to Defendant's contacts with California. Accordingly, it would not offend notions of fair play and due process to exercise personal jurisdiction over each Defendant.

**FACTUAL ALLEGATIONS**

26. Tomales Bay Capital, L.P. ("Tomales Bay") is an established growth-stage investor headquartered in San Francisco, California, with extensive experience forming special purpose vehicles for investment purposes. The Firm's strategic focus is to identify and invest in later-stage technology companies that are private and are emerging leaders within rapidly growing technology markets. Tomales Bay has, for example, invested through special purpose vehicles in SpaceX, a private company based in Hawthorne, California, since 2015 in multiple primary and secondary financings.

**A.    Leo Group Makes Misrepresentations in Order for Leo Investments to Become an LP of the Fund and Take on Various Strict Confidentiality Obligations.**

27.    In the late fall of 2021 Mr. Kahlon was raising funds from investors for Tomales Bay to purchase $528 million of highly coveted SpaceX shares from another investor in the private market. Mr. Kahlon planned to execute the investment primarily through Anduril III, a fund specifically created for the purchase of SpaceX stock, subject to the purchase of the shares being approved by SpaceX through its unique approval processes. While SpaceX had preliminarily given the green light to Tomales Bay to purchase the $528 million of shares from the other investor that was interested in selling, SpaceX's ultimate approval of the Fund's purchase, including SpaceX's waiver of its ROFR as to the shares being sold remained outstanding.

28.    In October 2021, Plaintiffs were approached by an investment broker, Mr. Farhan Hussain, who informed Plaintiffs that Leo Group was potentially interested in joining the Fund. Leo Group is a China-based company, principally engaged in machinery manufacturing and the provision of Internet services.

29.    Mr. Hussain is affiliated with Gulf Asia Venture Group ("GAVG"), an investment advisory firm. GAVG's second primary broker is an individual named George Yang.

30.    Upon information and belief, through Mr. Yang, GAVG reached out to Leo Group in early October 2021 to inform it of an investment opportunity in SpaceX through the Fund. Over the next couple of weeks, Leo Group internally discussed the possibility of participating in the Investment. Soon thereafter, GAVG reached out to the GP on Leo Group's behalf, and the Fund then sent a Private Placement Memorandum ("PPM") and related materials to Leo Group.

31.    GAVG then scheduled an initial virtual meeting between Mr. Kahlon, the founder and CEO of San Francisco-based Tomales Bay, and Leo Group representatives to take place on or around November 2, 2021. During this meeting, Plaintiffs shared with Leo Group details about the contemplated Investment, including the likely share price at which the Fund hoped to purchase SpaceX shares from the other investor, the overall size of the investment position, the timing of the Investment, the roles the Fund's GP would play in managing the Investment, and Tomales Bay's relationship with SpaceX. At this time, Plaintiffs also made clear to Leo Group's representatives that confidentiality

was of the utmost importance to both Plaintiffs and SpaceX—indeed, that it was a *sine qua none* of successfully obtaining the SpaceX shares that the Fund was targeting on the secondary market.

32. During this initial meeting, Leo Group, through Steven Zhang—the Leo Group director and Vice President most involved with the Investment—represented that it understood the importance of confidentiality for the Investment. Mr. Zhang noted that Leo Group was subject to certain confidentiality and disclosure requirements, but that these requirements could be made compatible with the disclosure restrictions on the Investment that the Fund would be imposing on its LPs.

33. Following the initial meeting on November 2, 2021, Leo Group and Plaintiffs began discussing a possible side letter that would modify certain terms of the LPA as applied to Leo Investments and its affiliates. In so doing, Plaintiffs sought to address the disclosure concerns raised by Leo Group during negotiations about its disclosure obligations. Leo Group retained MagStone Law, based out of Sunnyvale, California, to represent it during these negotiations. At first, Plaintiffs were not willing to deviate from the strict parameters of the LPA due to the sensitivities surrounding the Investment. In the negotiations, however, Leo Group, through Zhang, represented to Plaintiffs that it had no desire to make any disclosures regarding the Investment that it was not legally required to make, and that it was only because it is a public company in China that its regulators would require some sort of disclosure after the Investment was made.

34. Based on Zhang's representations, Plaintiffs came up with a solution tailored to Leo Group's circumstances. In conversations that took place in early November, after the initial virtual meeting between the parties, Kahlon informed Zhang that the Fund GP would accept a side letter to the LPA that would permit disclosure of information about the Investment *only* to the extent disclosure was required by law, *but only* after certain other pre-conditions were met: that the GP was first notified in writing of the requirement of any disclosure and of what specifically was required by law to be disclosed, and that Leo Investments and its affiliates would cooperate with the GP to avoid or to minimize the scope of any such disclosure. By imposing these conditions, Plaintiffs hoped to cooperatively and effectively address the regulatory obligations that Leo Group had suggested it was

under, through a process that was commercially feasible but in line with the otherwise-absolute confidentiality restrictions on LPs contained in the LPA.

35. Keenly aware of how important these restrictions are to SpaceX, Kahlon took care to communicate the negotiated disclosure conditions—effectively, a strict and narrowly tailored set of carve outs from the LPA—to Zhang before allowing Leo Group's participation in the Investment to move forward.

36. After Kahlon informed Zhang that the Fund GP would permit disclosures pursuant to the disclosure conditions as they had been communicated to Zhang and then set out in the Side Letter and LPA, Zhang assured Kahlon that Leo Group understood and agreed to them, and that it did not need or intend to disclose any information regarding the Investment beyond what was strictly necessary. As a result of these representations, Plaintiffs agreed to allow Leo Investments to execute a subscription agreement and the Side Letter to become an LP of the Fund.

37. As detailed below, the Side Letter was executed on November 15, 2021, between Leo Group's subsidiary, Leo Investments, and the GP. Leo Investments' capital commitment was wired to Plaintiffs that same day.

38. In relevant part, the LPA restricted LPs, including Leo Investments, from disclosing any information about the Plaintiffs or the contemplated investment in SpaceX, except if ▉▉▉▉ ▉▉▉▉ As to Confidential Information about the Plaintiffs or the contemplated investment in SpaceX, again only ▉▉▉▉ ▉▉▉▉ LPA § 7.12(a). For example, while an LP was permitted to disclose Confidential Information when such disclosure was ▉▉▉▉ ▉▉▉▉ ▉▉▉▉ *Id.* Such notification was required to ▉▉▉▉ Further, each LP was required to avoid or minimize the disclosure to be made, including to:

▉▉▉▉

[REDACTED]

*Id.*

39. The Side Letter was entered into between Plaintiffs and Leo Investments and was explicitly only for the benefit of Leo Investments and no affiliated entities. As to confidentiality, the Side Letter provided that [REDACTED] (emphasis added). The Side Letter was clear, however, that [REDACTED]

40. That same day on November 15, 2021, $50 million was wired to the Fund's account with Silicon Valley Bank as Leo Investments' Capital Contribution (as defined in the LPA).

**B.   Leo Group Blatantly Disregards Leo Investments' Obligations and Disseminates Confidential Information About the Investment.**

41. As detailed above, the LPA and Side Letter placed significant confidentiality obligations on Leo Investments, including, but not limited to, notice, cooperation, and minimization obligations. Despite these restrictions (indeed, ignoring all of them), on the evening of November 16, 2021, Leo Group filed a disclosure with the Shenzhen Stock Exchange (the "Disclosure"). Among much else, this disclosure stated that Leo Group would be investing in SpaceX through Leo Investments' participation in the Fund, provided the estimated size of the Fund, and set forth several other details regarding the parties' operating agreements. *Id.*

42. Plaintiffs have come to learn that on the same day, multiple Leo Group employees also participated in interviews with the media regarding the Investment. The Leo Group employees who

participated in interviews regarding the Investment included, but may not have been limited to, Zhou Liming, Chen Yunkui, and Wang Shubing. Leo Group employees also shared news of the Investment on social media.

43. Later on November 16, 2021, numerous media outlets reported on Leo Group's participation in the Investment, referencing both the Disclosure and quoting the Leo Group employees that participated in interviews regarding the Investment. Kahlon became aware of certain of these articles and immediately expressed his displeasure at the widespread reporting on Leo Group's participation in the Investment to George Yang from GAVG. Kahlon was concerned that such widespread media reporting may frustrate SpaceX, given the company's emphasis on confidentiality.

44. Kahlon indicated to Yang that SpaceX might take actions adverse to Plaintiffs and Leo Group if it learned of the media reporting, including possibly terminating the Investment as a whole. In light of Leo Investments' failure to notify Plaintiffs beforehand not only of the content, timing, or necessity of these disclosures, but also that the disclosures would be targeted towards or reach public news outlets; and further due to Leo Investments' failure to cooperate with Plaintiffs in avoiding or minimizing the disclosure, the disclosures were in breach of the Side Letter and the LPA.

45. Following the November 16 disclosure and the widespread media reporting on Leo Group's participation in the Investment, Leo Group's stock price rose significantly. Between November 16 and November 18, Leo Group's stock price in China rose by 20%. On November 16, Leo Group's stock price increased by 3.4%; on November 17 it increased by 9.88%; and on November 18, it increased by 10.11%. Leo Group's stock price increase prompted the Shenzhen Stock Exchange to suspend trading of Leo Group's stock and resulted in Leo Group making a disclosure to the Exchange regarding "Abnormal Stock Trading Fluctuations."

46. The increase in stock price over these few days resulted in an increase in market capitalization for Leo Group of over $627 million.

47. On November 19, 2021, SpaceX's CFO, Bret Johnson, based out of Irvine, California, contacted Kahlon to express displeasure about the media coverage of Leo Group's public disclosures. Johnson informed Kahlon that SpaceX was upset at the media attention garnered by Leo Group's

1  disclosures. Through Johnson, SpaceX took the position that it would not permit the Fund to invest
2  in SpaceX if Leo Investments remained an LP in the Fund (and, thereby, an indirect investor in
3  SpaceX).

4    48. SpaceX was concerned about U.S.-based regulatory inquiries and burdens if there was
5  too much media attention regarding foreign investors in SpaceX—which was one of the reasons
6  behind the confidentiality obligations the parties had agreed to when signing the subscription
7  agreement and the Side Letter. These concerns were compounded for the GP by the fact that Leo
8  Group and Leo Investments, having disclosed confidential information about the Investment, were
9  facing additional scrutiny by Chinese regulators, compliance with which might exacerbate SpaceX's
10 unhappiness with the disclosures and further undermine the Fund's ability to complete the Investment.

11   49. The GP's and SpaceX's concern regarding additional disclosures that might be required
12 as a result of Leo Group's breaches of Leo Investments' confidentiality obligations were confirmed a
13 few short days after those initial disclosures, as the Shenzhen Stock Exchange issued an "Attention
14 Letter" to Leo Group requesting additional details regarding Leo Group's participation in the
15 Investment.

16   50. On November 21, 2021, given the choice between losing the opportunity to invest in
17 SpaceX for all LPs altogether or removing Leo Investments, which had breached its obligations under
18 the LPA and Side Letter, the GP chose the latter. In an exercise of its reasonable judgment, per the
19 LPA, the GP informed the Defendant that because of SpaceX's reaction to its disclosures, and in light
20 of the additional regulatory scrutiny these breaching disclosures had triggered (and were threatening
21 to further trigger if Leo Investments remained in the Fund, both in the United States and China),
22 Plaintiffs decided to remove Leo Investments from the Fund pursuant to Section 7.7 of the LPA.

23   51. Between November 21 and 22, 2021, Plaintiffs attempted to work with Defendant to
24 facilitate a cooperative withdrawal of Leo Investments from the Fund. The Parties, however, were
25 unable to reach an agreement, as Defendant refused to voluntarily withdraw Leo Investments from the
26 Fund.

52. On November 22, 2021, Plaintiffs sent Defendant a withdrawal notice, stating that the GP was exercising its right under the LPA to terminate Leo Investments as an LP to the Fund. That same day, MagStone Law, Defendant's counsel, reached out to Plaintiffs stating that the withdrawal was not acceptable.

53. On November 23, 2021, Plaintiffs returned to Defendant the entirety of its $50 million capital contribution from Plaintiffs' account at the Silicon Valley Bank in Santa Clara, California.

54. The damage, however, had been done. Days later, SpaceX did not approve Tomales Bay, through its Funds, to purchase the $528 million in shares. Rather, notwithstanding that just a couple of weeks earlier it had pre-approved the purchase, SpaceX permitted a Tomales Bay fund to purchase a much smaller portion of the shares ($100 million), and otherwise SpaceX exercised its ROFR to purchase the vast majority of the shares ($428 million) for its own account rather than permit the Fund to purchase the shares. Upon information and belief, SpaceX took this action in exercising its ROFR because of the media spectacle that Leo Group had ignited days earlier.

55. Anduril III, the GP, and their investors have been damaged to a significant extent due to the lost opportunity to invest in SpaceX stock. The Fund and the GP have also been damaged generally with respect to the GP's long-term relationship with SpaceX, which deteriorated as a result of Leo Group's actions. More specifically, and tangibly, the GP lost the opportunity to earn significant amounts in Management Fees as well as Carried Interest (both as defined in the LPA). The Fund's LPs were also damaged insofar as they lost the opportunity to invest in SpaceX and earn carry on the Investment. Leo Group's manipulative and deceptive conduct in inducing Plaintiffs to permit Leo Investments to become an LP and then causing Leo Investments to blatantly breach the confidentiality obligations of the LPA and Side Letter, all in an effort to bolster Leo Group's public profile and to increase its own stock price, was the direct cause of this extensive damage to Plaintiffs.

C. **Leo Investments Files a Lawsuit Arising Out of the SpaceX Investment in Delaware.**

56. On February 23, 2022, Leo Investments filed a Complaint in the Delaware Court of Chancery against the Fund, the GP, and Iqbaljit Kahlon, alleging breach of contract and breach of fiduciary duty for having removed Leo Investments as an LP (the "Delaware Action").

57. The parties to the Delaware Action have engaged in substantial discovery. Leo Investments and Leo Group have produced 6,047 documents, while Tomales Bay has produced 4,551 documents. In relation to the Delaware Action, Tomales Bay has also deposed Steven Zhang, Wang Xiangrong (Leo Group's chairman), Wang Zhuangli (another Leo Group board member), and Cassie Zhang (another Leo Group employee).

58. The discovery in the Delaware Action is subject to an August 15, 2023 protective order (the "Delaware Protective Order"), which generally precludes the use of Confidential Information (as defined in the Delaware Protective Order) outside of the Delaware Action.

59. In order to remain in compliance with the Delaware Protective Order, this Complaint is narrowly focused. Much of the information Plaintiffs learned about Leo Group and its activities through discovery in the Delaware Action cannot be used for pleading purposes at this time, but is expected to emerge in discovery in this matter.

### D. Leo Group Availed Itself of the Privilege of Conducting Activities Within California.

60. As noted above (¶25), through, among other things, its misrepresentations in establishing its affiliate Leo Investments as an LP in the Fund, and in causing Leo Investments to breach the Agreements, Leo Group availed itself of the privilege of conducting activities within California.

61. As previously noted, in pursuing the Investment, Leo Group purposefully directed its activities at California by, among other things, deceiving a California-based General Partner to permit Leo Investments to become a limited partner of the Fund, a California-based limited liability corporation formed for the sole purpose of investing in SpaceX, a California company; engaging and working with California lawyers at a California law firm, MagStone Law, which represented Leo Group during negotiations with Plaintiffs; and ultimately, causing harm to Plaintiffs in California.

62. The Agreements also emphasized the venture's California-centric activities. For example, as shown below, the Side Letter's header made clear that the GP was located in California.

```
Tomales Bay Capital Anduril III GP, LLC
575 Market Street, 15th Floor
San Francisco, CA 94105
```

The Side Letter further stated that Leo Group's funds could only be used to invest in SpaceX, another California-based entity.

63. Upon execution of the Agreements on November 15, 2021, Gina Cibuzar, a Tomales Bay employee based out of San Francisco, emailed Leo Group instructions for Leo Group to wire its capital commitment, as shown below.





64. The wire instructions stated that Leo Group was to wire its capital commitment to the Fund's account with a Santa Clara-based bank (Silicon Valley Bank).

65. As detailed above, Leo Group followed these wiring instructions and caused $50 million to be wired to the Fund's California bank account, permitting Leo Investments to become an LP to the California-based Fund.

66. By completing this process, Leo Group caused Leo Investments and itself to incur obligations in California. The LPA imposed several continuing obligations on Leo Investments and its affiliates in California, including, but not limited to, ███████████ ███████████ (LPA § 7.3(a)); ███████████ ███████████ ███████████ (LPA § 7.3(b)); ███████████ (LPA § 7.12(a)); ███████████ (LPA § 6.2(e)).

## CAUSE OF ACTION

### FRAUD

67. Plaintiffs repeat and reallege all paragraphs set forth above.

68. Over a two-week period from November 1 through November 15, 2021, as set forth above, Defendant falsely represented to Plaintiffs that it and its affiliate Leo Investments would abide by the confidentiality obligations agreed to in the Side Letter and LPA, including by providing the GP with written notice in advance of any disclosure obligation required by law, cooperate to avoiding and minimizing any such disclosure, and to only making disclosures regarding the planned SpaceX investment to the extent required by law after meeting these other explicit preconditions.

69. Despite these representations to Plaintiff, upon information and belief, Defendant knew that it intended to make disclosures immediately after it caused Leo Investments to subscribe to be an LP, without notice to the GP and without meeting its cooperation obligations, and that such disclosures would contain information beyond what was strictly required by law, including, for example, the fact that the target of the Fund's investment was SpaceX. Specifically, upon and information and belief,

Defendant and Steven Zhang knew that they intended to distribute news of the investment to the public, including through media interviews and social media postings, even as they were negotiating disclosure language for the Agreements with Plaintiffs, all for the purpose of bolstering their company's profile and increasing Leo Group's stock price.

70. Upon information and belief, Defendant and Steven Zhang's misrepresentations were made with the intent to induce Plaintiffs to enter into the Agreements. Defendant understood that confidentiality was a key consideration for both Plaintiffs and SpaceX, and that Plaintiffs would not permit Leo Investments to become an LP of the Fund without a commitment to strict confidentiality as dictated by the provisions of the LPA and Side Letter.

71. Plaintiffs relied upon Defendant and Steven Zhang's misrepresentations when deciding to enter into the Agreements with Leo Investments. But for these misrepresentations, Plaintiffs would not have permitted Leo Investments to join the Fund.

72. As a result of Plaintiffs' reasonable reliance on Defendant's numerous misrepresentations, and Defendant's subsequent actions, Plaintiffs and their investors (other LPs) lost the opportunity to invest in SpaceX through the Fund in late 2021, lost the opportunity to earn Management Fees and Carried Interest, suffered reputational harm in the deterioration of their relationship with SpaceX, and suffered damages in an amount exceeding $150,000,000. Plaintiffs accordingly seek compensatory and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant and:

73. Award Plaintiffs damages in an amount exceeding $150,000,000, to be proven at trial;

74. Award Plaintiffs punitive damages as this Court deems just and equitable under the circumstances;

75. Award costs and expenses incurred by Plaintiffs in connection with this action; and

76. Award Plaintiffs such other relief as this Court deems just and equitable under the circumstances.

**DEMAND FOR JURY TRIAL**

77. Plaintiffs demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: August 6, 2024

By: /s/ Austin Norris

Austin Norris (SBN 284603)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (213) 680-8184
austin.norris@kirkland.com

Aaron M. Marks, P.C. (*Pro Hac Vice* forthcoming)
Ahson T. Azmat (*Pro Hac Vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
aaron.marks@kirkland.com
ahson.azmat@kirkland.com

*Attorneys for Plaintiffs*
*Tomales Bay Capital Anduril III, L.P. and Tomales Bay Capital Anduril III GP, LLC*